**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

GUARDANT HEALTH, INC.,     )
                               )
        Plaintiff,        )
                               )
     v.                  )     Civil Action No. 17-1616-LPS-CJB
                               )
FOUNDATION MEDICINE, INC.,   )
                               )
        Defendant.   )
GUARDANT HEALTH, INC.,     )
                               )
        Plaintiff,        )
                               )
     v.                  )     Civil Action No. 17-1623-LPS-CJB
                               )
PERSONAL GENOME DIAGNOSTICS, )
INC.,                            )
                               )
        Defendant.   )

## MEMORANDUM ORDER

In these patent infringement actions, Plaintiff Guardant Health, Inc. ("Guardant") moves to compel (the "Motion") Defendants Foundation Medicine, Inc. ("FMI") and Personal Genome Diagnostics, Inc. ("PGDx" and collectively with FMI, "Defendants") to destroy a communication drafted by Maya Skubatch of Wilson, Sonsini, Goodrich & Rosati, P.C., counsel for Guardant (the "Skubatch communication"); the communication was ultimately transmitted to Guardant's current Chief Executive Officer ("CEO"), Dr. Helmy Eltoukhy, in 2012 while he was employed by a third party, Illumina, Inc. ("Illumina"). (Civil Action No. 17-1616-LPS-CJB, D.I. 203; Civil Action No. 17-1623-LPS-CJB, D.I. 349)[1] For the reasons set forth below, the Court GRANTS Guardant's Motion.

## I.    BACKGROUND

---

[1]    For simplicity's sake, the Court will hereafter refer to the "D.I." number in Civil Action No. 17-1623-LPS-CJB, unless otherwise indicated.

Dr. Eltoukhy was employed by Illumina from August 2008 until January 2013. (D.I. 364 at ¶ 4) Dr. AmirAli Talasaz was employed by Illumina from March 2009 until June 2012. (*Id.* at ¶ 5) During the second half of 2012, Dr. Eltoukhy and Dr. Talasaz co-founded Guardant. (*See* D.I. 238 at ¶ 1) When Dr. Eltoukhy left Illumina, he became CEO of Guardant. (D.I. 238 at 1; D.I. 353 at 1)

In connection with Guardant's Motion, Ms. Skubatch submitted a declaration stating that the Skubatch communication is part of correspondence that she had "with Guardant []" in the summer of 2012, when Guardant had engaged Ms. Skubatch's law firm to provide legal services and advice. (D.I. 353, ex. B at ¶ 3) The Skubatch communication, dated August 8, 2012, includes a set of draft patent claims with comments and questions directed (at least on their face) to Dr. Talasaz. (*Id.*, ex. A; *id.*, ex. B at ¶ 4) Ms. Skubatch confirmed that she emailed a version of the Skubatch communication "to Guardant" on August 10, 2012, and that she intended the Skubatch communication to remain in confidence. (*Id.*, ex. B at ¶¶ 3-4)

In response to subpoenas served on Illumina by Defendants in connection with these actions, Illumina conducted a search for documents. In doing so, Illumina discovered the Skubatch communication on Illumina's email system, in Dr. Eltoukhy's Illumina email files. (D.I. 364 at ¶¶ 7-9) The Skubatch communication was attached to an email from Dr. Eltoukhy's Illumina email address that was sent on December 15, 2012; the email cover sheet does not indicate to whom the communication was sent. (*Id.* at ¶¶ 8-9; D.I. 362, exs. 5-6)

On May 29, 2019, Illumina produced to Defendants nearly 50,000 pages of documents, including the Skubatch communication. (D.I. 353 at 1; D.I. 364 at ¶¶ 7-9)[2] On August 6, 2019,

---

[2]      Two copies of the Skubatch communication were produced by Illumina, labeled ILL_GUARD0002233 and ILL_GUARD0043458. (D.I. 353 at 1 n.1; D.I. 364 at ¶¶ 8-9)

Illumina attempted to claw back the Skubatch communication pursuant to Section 14 of the

Protective Order entered in these cases.  (D.I. 353, ex. C)  Guardant joined the request the next

day, asserting that the Skubatch communication is protected by the attorney-client privilege.

(*Id.*)[3]  Defendants have not complied with Guardant's claw back request and have not destroyed

the communication.  (D.I. 353 at 1)

On August 29, 2019, Guardant filed the instant Motion.  (D.I. 349)  The parties submitted

letter briefs and related materials, (D.I. 353; D.I. 362; D.I. 364; D.I. 366; D.I. 367; D.I. 369), and

the Court heard telephonic argument on the Motion on September 16, 2019, (D.I. 396;

hereinafter, "Tr.").

## II.     STANDARD OF REVIEW

The United States Court of Appeals for the Third Circuit has held that in order for

the attorney-client privilege to protect a communication, "it must be (1) a communication (2)

made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing

legal assistance for the client."  *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011) (internal

quotation marks and citations omitted)).  "'Privileged persons' include the client, the attorney(s),

and any of their agents that help facilitate attorney-client communications or the legal

representation."  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (citation

omitted).  Because the privilege militates against the general rule promoting full disclosure of

information between parties to a lawsuit, courts must construe it narrowly.  *Westinghouse Elec.*

*Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991).  In line with the narrow

construction that it receives, "[t]he privilege protects *only* those disclosures—necessary to obtain

---

[3]     Illumina subsequently withdrew its request.  (D.I. 364 at ¶ 10)

informed legal advice—which might not have been made absent the privilege." *Id.* at 1423-24 (emphasis in original) (internal quotation marks and citation omitted).

The party asserting the privilege bears the burden of establishing the requisite elements. *See, e.g., TC Tech. LLC v. Sprint Corp.*, No. 16-cv-153-RGA, 2018 WL 6584122, at *2 (D. Del. Dec. 13, 2018). Generally, a party's voluntary disclosure to a third party of information purportedly protected by the attorney-client privilege destroys the information's confidentiality, thus obviating the privilege. *Westinghouse Elec. Corp.*, 951 F.2d at 1424.

## III.    DISCUSSION

Because the Skubatch communication was found on the servers of third-party Illumina, within Dr. Eltoukhy's Illumina email account, the main focus of Defendants' challenge to Guardant's claim of privilege is whether Guardant has established that the Skubatch communication was made "in confidence." (D.I. 362 at 2; Tr. at 6, 20-26, 35) The Court will first address this challenge, and will then turn to Defendants' remaining arguments.

### A.    Was the Skubatch Communication Made "In Confidence?"

As noted above, the attorney-client privilege applies only to "confidential communication[s][,]" with such confidentiality having "both a subjective and objective component; the communication must be given in confidence, and the client must *reasonably* understand it to be so given." *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 255 (Bankr. S.D.N.Y. 2005) (emphasis in original). For her part, Ms. Skubatch has declared that when she made the communication at issue, she intended that it remain in confidence. And Dr. Eltoukhy, in a declaration also submitted by Plaintiff, has stated that he understood the communication to be confidential and did not intend to disclose it to a third party. (D.I. 366, ex. 1 at ¶ 3) So the key question here is whether Dr. Eltoukhy's understanding that the communication remained

4

confidential is *reasonable*, in light of the circumstances at issue (including the fact that the communication resided on Dr. Eltoukhy's work computer at Illumina, and ultimately remained in Illumina's possession for years after Dr. Eltoukhy left the company).

The parties agree that in order to examine a question like this—i.e., to measure an employee's reasonable expectation of privacy in his computer files and e-mail—the Court should consider at least the factors set out *In re Asia Global Crossing Ltd.*, 322 B.R. 247 (Bankr. S.D.N.Y. 2005) (the "*Asia Global* factors"). (D.I. 362 at 2; Tr. at 6, 16, 21) The *Asia Global* factors are: "(1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or email, (3) do third parties have a right of access to the computer or emails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?" *In re Asia*, 322 B.R. at 257-58.[4] Defendants contend that a balancing of these factors demonstrates that Dr. Eltoukhy had no reasonable expectation of privacy in his Illumina computer and email, and that the Skubatch communication was therefore one not made "in confidence." (D.I. 362 at 2) The Court will assess this argument by addressing the *Asia Global* factors in turn.

> **1.    Did Illumina Maintain a Policy During the Relevant Time Period Banning Personal or Other Objectionable Use of Email Communications like the Skubatch Communication?**

---

[4]        Other courts have also relied on these same *Asia Global* factors to resolve questions regarding an employee's reasonable expectation of privacy in his computer files and e-mail. *See, e.g.*, *Pinnacle Surety Servs., Inc. v. Manion Stigger, LLP*, 370 F. Supp. 3d 745, 752-53 (W.D. Ky. 2019); *Kreuze v. VCA Animal Hosps., Inc.*, Civil Action No.: PJM-17-1169, 2018 WL 1898248, at *1 (D. Md. Apr. 20, 2018); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-2509-LHK-PSG, 2013 WL 772668, at *6-7 (N.D. Cal. Feb. 28, 2013).

In addressing the first *Asia Global* factor—whether Illumina maintained a policy during the relevant time period banning personal or other objectionable use of email communications like the Skubatch communication—Defendants point to two Illumina documents.

First, Defendants cite to a document entitled "Illumina Code of Conduct[.]" (*Id.*) This document states that "[c]ompany assets and information[,]"—defined to include "[i]nformation created, accessed, transmitted, or stored using Company provided technology resources, such as email messages" should "only be used for legitimate business purposes of" Illumina. (D.I. 362, ex. 1 at 18) The problem for Defendants is that this document is dated 2016, but the relevant time period (in which Ms. Skubatch sent the communication and in which Dr. Eltoukhy received and stored the communication) is actually many years earlier (2012). (*See* Tr. at 7-8 (Plaintiff's counsel arguing that "[w]e all know that these [Code of Conduct] policies shift and we all know that they've gotten much stronger over the last five [to] ten years[,]" such that an earlier-such policy may not be identical to a later-such policy); *id.* at 27 (FMI's counsel acknowledging that "we don't know the answer" to whether Illumina's current Code of Conduct mirrors that in effect in 2012)) Defendants have not produced a version of Illumina's Code of Conduct that covered this key time period.

Defendants also cite to an Illumina "Code of Ethics" document dated January 28, 2010. (D.I. 362 at 2 (citing *id.*, ex. 2 at 3)) This particular document notes that "[a]ll Company assets should be used only for legitimate business purposes[.]" (*Id.*, ex. 2 at 3) A difficulty here, however, is that: (1) this statement is a bit vague and (2) the term "Company assets" is not otherwise defined in the Code of Conduct. Did non-Illumina-work-related email communications (like the Skubatch communication) count as material contained on Illumina "Company assets"? Perhaps so, as it seems reasonable to think that a company's email and

computer system amounts to a company "asset[.]"[5]  But even if so, did this one-sentence

statement in the Code of Ethics amount to a complete "ban[]" on Illumina employees using their

work email for personal use?  In a world in which email is now (and was at the time) ubiquitous,

that is somewhat less clear to the Court.

Perhaps, in light of the wording of the Code of Ethics (ambiguous though it may be), this

factor can be said to slightly favor Defendants' position.  But not more than that.

### 2. Did Illumina Monitor the Use of Dr. Eltoukhy's Computer or Email?

With respect to the second *Asia Global* factor—whether Illumina monitored the use of

Dr. Eltoukhy's computer or email—Defendants again point to two documents.

First, they rely on the Code of Conduct from 2016 to show that Illumina "may access,

monitor, or inspect any Company resources, assets, and property at any time without prior

approval or knowledge or [employee] consent" which "includes monitoring and retrieving

information that is stored or transmitted on Company electronic devices, computer equipment,

applications, and systems." (D.I. 362 at 2 (citing *id.*, ex. 1 at 18))  But again, this Code of

Conduct was not in existence during the relevant time period.  And so it is not particularly

helpful in assessing whether Dr. Eltoukhy's expectation of privacy as to the Skubatch

communication was reasonable.  Moreover, whether Illumina had the *ability* to monitor and

retrieve information on Dr. Eltoukhy's computer in the relevant time frame is one thing; whether

it *actually did so* is yet another.  *See, e.g., Kreuze v. VCA Animal Hosps., Inc.*, Civil Action No.:

PJM-17-1169, 2018 WL 1898248, at *2 (D. Md. Apr. 20, 2018) (concluding that although the

---

[5]      Indeed, Guardant itself—co-founded by Dr. Eltoukhy—has a "Business Code of Conduct and Ethics" stating that "[a]ll Company assets should be used only for legitimate business purposes" and that "Company property includes all data and communications transmitted or received to or by, or contained in, the Company's electronic or telephonic systems." (D.I. 362, ex. 3 at 5)

defendant had a policy in place at the relevant time stating that it retained the right to monitor its computer systems, the lack of evidence indicating that defendant in fact actively monitored those systems weighed in favor of maintaining the privilege); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-2509-LHK-PSG, 2013 WL 772668, at *7 (N.D. Cal. Feb. 28, 2013) (same, with regard to a similar policy of the defendant and a similar lack of evidence that the defendant monitored its employee's emails).  There is no record evidence speaking to the latter issue, which is the more critical one here.

Second, Defendants rely on an affidavit of Herman Sotomayor, Senior Director, People Support & Care at Illumina (the "Sotomayor Affidavit").  In the Sotomayor Affidavit, Mr. Sotomayor explains that although Illumina was "unable to locate [its] IT Policies and Procedures . . . in place between 2008 and 2013, on information and belief, Illumina believes that the current IT Policy is similar to the IT Policy utilized between 2008 to 2013 in that both IT Policies maintain that any documents or emails stored on company computers, servers or systems are the exclusive property of Illumina." (D.I. 364 at ¶ 14)[6]  Again, though, whether such systems are the exclusive property of Illumina is one thing; whether Illumina regularly monitored those systems at the relevant time is another.  Moreover, Dr. Eltoukhy declared that to the best of his knowledge, he does not "recall any Illumina policy during [his] employment that would allow Illumina to access, monitor, or inspect information in [his] Illumina email account or that any information in [his] Illumina email account would become property of Illumina." (D.I. 366, ex. 1 at ¶ 2)

---

[6]     While there are Illumina "Code of Conduct" and "Code of Ethics" documents in the record, there is no Illumina document in the record entitled "IT Policies and Procedures."  So it is a bit unclear what type of document, exactly, Mr. Sotomayor is referring to here.

Without any real evidence of the record indicating that Illumina monitored the use of Dr. Eltoukhy's computer or email in this time period—and with some evidence suggesting that it did not have a policy in place that would have permitted such monitoring—this factor weighs in favor of Plaintiff's position.

### 3. Did Third Parties Have a Right of Access to Dr. Eltoukhy's Computer or Emails?

With respect to the third *Asia Global* factor—whether third parties had a right of access to Dr. Eltoukhy's computer and emails—there is no evidence here that third parties had such a right of access. This factor weighs in favor of Plaintiff's position.

### 4. Did Illumina Notify Dr. Eltoukhy, or was Dr. Eltoukhy Aware, of Illumina's Use and Monitoring Policies?

In support of the fourth *Asia Global* factor, which evaluates an employee's knowledge of the corporation's policies with respect to email use and monitoring, Defendants again rely on the Sotomayor Affidavit. It explains that between 2008 and 2013, Illumina required each of its employees to sign an "Acknowledgement of Receipt and Review of Illumina's IT Policies and Procedures" (the "IT Acknowledgement"). (D.I. 364 at ¶ 11) Although Illumina believes that Dr. Eltoukhy would have been asked to sign an IT Acknowledgement when he began employment with Illumina, Illumina was unable to locate that form (though it was apparently able to locate and produce the IT Acknowledgement form signed by Dr. Talasaz at the beginning of his employment with Illumina). (*Id.* at ¶¶ 12-13)[7] Dr. Eltoukhy, meanwhile, does "not recall

---

[7] Dr. Talasaz's IT Acknowledgement is not in the record before the Court.

signing or agreeing to an IT acknowledgement from Illumina nor [is he] aware of any record of such an acknowledgement." (D.I. 366, ex. 1 at ¶ 1)[8]

In the absence of an IT Acknowledgement actually signed by Dr. Eltoukhy, and in light of Dr. Eltoukhy's memory that he does not recall signing any such form, this factor favors Plaintiff's position.

### 5.    Conclusion

On balance, the *Asia Global* factors support the preservation of the privilege with respect to the Skubatch communication. The record is just not very clear as to what rights Illumina had, or what Illumina was (and was not) doing in the relevant time period with regard to email communications like the one at issue here. With Dr. Eltoukhy's declaration supporting the notion that he did retain some significant, reasonable expectation of privacy in such communications, and with little of record to clearly counter that, Plaintiff has the better of the argument.

### B.    Defendants' Other Arguments

In their letter brief, Defendants make a few other arguments regarding the absence of privilege. None are availing.

### 1.    Is Dr. Eltoukhy a Privileged Person?

For example, Defendants assert that the Skubatch communication is not privileged because Dr. Eltoukhy is not a privileged person (in that he did not have a sufficiently clear or

---

[8]      Defendants retort that Dr. Eltoukhy's declaration with respect to this issue "contradicts" his sworn deposition testimony that he was sure that he must have read "Illumina's code of conduct" and complied with it. (D.I. 367) The Court does not find any such contradiction on this record, as the IT Acknowledgement and Code of Conduct seem to be two different documents. (*See, e.g.*, D.I. 362, ex. 2; D.I. 364 at ¶ 11; D.I. 369 at 2)

official role with Guardant at the time of the communication). (D.I. 362 at 3)  This argument

fails.  In a previous motion to compel, PGDx had requested that the Court order Guardant to

produce certain communications with Dr. Eltoukhy because, *inter alia*, he was not a "privileged

person."  (D.I. 230 at 2-3)  During argument on this motion, PGDx's counsel then agreed that the

Court should "hold the motion in abeyance" because "some more discovery is required" with

respect to inconsistencies in the record regarding Dr. Eltoukhy's role at Guardant while

employed by Illumina.  (D.I. 290 at 35-37)  The Court ultimately denied PGDx's motion to

compel without prejudice to renew following a supplemental deposition of Dr. Eltoukhy that

would further explore this issue.  (D.I. 261)

     Presently, though, Defendants simply assert in their letter briefing that Dr. Eltoukhy is

not a privileged person for "all the reasons PGDx explained in its previous motion to compel[.]"

(D.I. 362 at 3)  Yet if even PGDx previously acknowledged that the record on this issue was not

sufficiently developed such that the Court could resolve the matter in its favor, then the Court

does not see how (with no further record evidence now presented) it can come to a contrary

conclusion.  Indeed, perhaps for this reason, Defendants appeared to give up on this basis for

relief during oral argument on the Motion.  (Tr. at 29)

     For these reasons, the argument cannot be a basis for denying the Motion.

     **2.**    **Was the Communication for the Purposes of Providing Legal Advice?**

     Next, Defendants argue that the evidence fails to show that the Skubatch communication

was for the purposes of obtaining or providing legal advice.  (D.I. 362 at 2-3)  Here they note

that the documents at issue: (1) do not have any obvious markers of privilege; (2) do not contain

the name of any law firm or attorney; (3) are not marked with any privilege designation; and (4)

were not attached to any attorney email communication.  (*Id.*)  They also point out that the

record fails to shed light on key details with respect to the Skubatch communication, such as when and how Dr. Eltoukhy received it, what other specific individuals may have received it, and who drafted the patent claims referenced in the document.  (*Id.* at 3)

In the Court's view, the record sufficiently demonstrates that the Skubatch communication was made by an attorney for Guardant for the purpose of providing legal advice. In her declaration, Ms. Skubatch states that the document "includes a set of draft patent claims and commentary for the purpose of providing legal advice to Guardant regarding patent prosecution." (D.I. 353, ex. B at ¶ 3)  To Ms. Skubatch's knowledge, the Skubatch communication was not intentionally communicated to any parties other than Guardant and Guardant's counsel. (*Id.*)  She explains that software used by her law firm generated the seven-digit document code visible in the footer of the Skubatch communication.  (*Id.* at ¶ 4)  And she relates that she prepared the questions and comments directed to Dr. Talasaz that are set out in the document, and explains that certain email correspondence associated with the Skubatch communication[9] "confirms that [she] included these comments and questions for the purpose of providing legal advice regarding *inter alia* claim scope and prior art." (*Id.*)

To be sure, the record could have been more robust here.  It would have been preferable if Guardant provided additional details about how, when, and from whom Dr. Eltoukhy received the Skubatch communication.  (*See* D.I. 362 at 3; Tr. at 24-25)  But the Court does note that, in an earlier declaration submitted by Dr. Eltoukhy, he explained his role in receiving documents like the Skubatch communication:

> Given my relationship with Guardant [as a member of the Board of Directors, and advisor and one of Guardant's largest investors], I was also informed about the preparation of intellectual property filings by Guardant's patent attorneys, including the draft patent

---

[9]    Ms. Skubatch did not attach this referenced email correspondence.

> filings related to the inventions of Dr. AmirAli Talasaz. These
> patent filings were prepared by Guardant in conjunction with our
> patent attorneys at Wilson Sonsini Goodrich & Rosati. In my role
> as a Board member, an advisor, investor and fiduciary to Guardant,
> Guardant and I had the same interest in ensuring early, robust
> intellectual property to protect Guardant's inventions. As such, I
> reviewed Guardant's early patent filings to help ensure that
> Guardant was proceeding diligently with such filings.

(D.I. 238 at ¶ 4; *see also* Tr. at 10, 12)

In sum, the evidence sufficiently demonstrates that the Skubatch communication was

communicated to Guardant and Dr. Eltoukhy for the purpose of providing Guardant with legal

advice with respect to patent prosecution. *See, e.g.*, *In re TQ Delta*, Civil Action No. 17-mc-

328-RGA, 2018 WL 5033756, at *3 (D. Del. Oct. 17, 2018) (finding that "information about

decisions made during patent prosecution . . . . is a clear example of legal advice intended to be

protected by the attorney-client privilege"); *Univ. City Dev. Partners, Ltd. v. Ride & Show

Eng'g, Inc.*, 230 F.R.D. 688, 696 (M.D. Fl. 2005) (finding that certain documents including draft

patent claims and an attorney's characterizations of those claims reveal specific legal strategies

or advice given by the attorney to his client and were privileged).

### 3.    Was There Waiver?

Finally, Defendants briefly argue that any privilege in the Skubatch communication has

been waived. (D.I. 362 at 3) They appear to argue that waiver applies here for two reasons.

First, Defendants assert that the Skubatch communication has been in Illumina's

possession since 2012, and "[i]t is well-settled that voluntary disclosure to a third party destroys

the attorney client privilege." (D.I. 362 at 3 (citing *Oasis Int'l Waters, Inc. v. United States*, 110

Fed. Cl. 87, 106-107 (Fed. Cl. 2013)) This argument is not persuasive, however, because there is

no evidence that Dr. Eltoukhy *voluntarily* disclosed the Skubatch communication to Illumina.

Rather, Dr. Eltoukhy states that he understood the documents to "be confidential privileged

communications" and he "did not send them to anyone outside of Guardant or its representatives, including employees of Illumina" and "did not intend for them to be disclosed to Illumina." (D.I. 366, ex. 1 at ¶ 3)

Second, Defendants assert that Guardant should not be permitted (on the one hand) to present testimony in this case that Dr. Eltoukhy did not review patent claims until after he was hired by Guardant in 2013, and then (on the other hand) withhold documents undermining such testimony by asserting attorney-client privilege. (D.I. 362 at 3; Tr. at 24, 28) Defendants did not cite to any legal authority in support of this argument. (D.I. 362 at 3) It is true there is caselaw supporting the proposition that a party may waive attorney client privilege in communications by "inject[ing] an issue into the litigation, the truthful resolution of which requires an examination of the confidential communications." *See, e.g.*, *Wilmington Savings Fund Soc'y, FSB v. Houston Casualty Co.*, Civil Action No. 17-01867 (MAK), 2018 WL 5043756, at *3 (D. Del. July 30, 2018) (internal quotation marks and citation omitted). But on this record, and with no caselaw citations or robust back-and-forth arguments from the parties with respect to this issue, the Court is not now prepared to find it to be a basis for waiver.

## IV.    CONCLUSION

For the reasons discussed above, the Court GRANTS Guardant's Motion. Defendants shall therefore comply with Fed. R. Civ. P. 26(b)(5)(B) and Paragraph 14 of the Protective Order issued in these actions and: (1) destroy the Skubatch communication within one week from the date of this Memorandum Order; and (2) confirm to Guardant the destruction of all copies of the communication within one week from the date of this Memorandum Order.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly

proposed, redacted version (if necessary) of the document.  Any such redacted version shall be

submitted by no later than **December 3, 2019** for review by the Court, along with a motion for

redaction that includes a clear, factually detailed explanation as to why disclosure of any

proposed redacted material would "work a clearly defined and serious injury to the party seeking

closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation

marks and citation omitted).  The Court will subsequently issue a publicly-available version of

its Memorandum Order.

Dated:  November 26, 2019

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

15